**UNITED STATES of America,
Plaintiff,**

v.

**Lawrence BENEDICT, a/k/a
"LB", Defendant.**

**No. 98–CR–6046L.**

United States District Court,
W.D. New York.

July 15, 2002.

Martin J. Littlefield, Asst. U.S. Atty., United States Attorney's Office, Buffalo, NY, Deirdre M. Flynn, Office of U.S. Attorney, Rochester, NY, for Plaintiff.

Donald M. Thompson, Gary Muldoon, Rochester, NY, Michael B. Berger, Williamsville, NY, John G. Swomley, Boston, MA, Edmund H. Robinson, Swomley & Associates, Boston, MA, for Defendant.

## DECISION AND ORDER

LARIMER, Chief Judge.

On June 8, 2001, defendant Lawrence Benedict ("Benedict") pleaded guilty to Count 2 of the indictment charging a violation of 18 U.S.C. § 2252(a)(1) (knowingly and unlawfully transporting child pornography in interstate commerce by mail). The plea was entered pursuant to a detailed written plea agreement. Approximately five months after entry of the guilty plea, on November 13, 2001, Benedict, now represented by new counsel, filed a motion to withdraw the guilty plea. Defendant seeks withdrawal of the guilty plea pursuant to Rule 32(e) of the Federal Rules of Criminal Procedure. The motion is in all respects denied.

### Standards for Withdrawal of Guilty Pleas Under Rule 32(e)

■ The standards relating to motions to withdraw guilty pleas are well established in the Second Circuit. This Court has from time-to-time ruled on similar motions. In *United States v. Miller,* 3 F.Supp.2d 376, 379–380 (1998), I set forth in some detail the standards for determining motions to vacate a guilty plea. In essence, the Court must determine whether there exists a "fair and just reason" to allow withdrawal of the plea. In *Miller,* I set forth the standards, and I repeat them here:

> Rule 32(e) of the Federal Rules of Criminal Procedure provides that the court may grant a motion for leave to withdraw a guilty plea, prior to sentencing, upon a showing of a "fair and just reason" for doing so. Nonetheless, "it is basic that '[a] defendant has no absolute right to withdraw his guilty plea.'"

*United States v. Torres,* 129 F.3d 710, 715 (2d Cir.1997) (quoting *United States v. Williams,* 23 F.3d 629, 634 (2d Cir.)), *cert. denied,* 513 U.S. 1045, 115 S.Ct. 641, 130 L.Ed.2d 547 (1994). "The defendant bears the burden of showing that there are valid grounds for relief." *United States v. Maher,* 108 F.3d 1513, 1529 (2d Cir.1997).

In determining whether a "fair and just reason" exists to grant a motion to withdraw a guilty plea, the court may consider various factors, including: the amount of time that has elapsed between the plea and the motion; whether the defendant is asserting his innocence; the likely voluntariness of the plea; and any prejudice to the Government. *Torres,* 129 F.3d at 715; *United States v. Doyle,* 981 F.2d 591, 594 (1st Cir.1992). "One especially important consideration is the defendant's answers to the questions posed at his Rule 11 hearing," *United States v. Trussel,* 961 F.2d 685, 689 (7th Cir.1992), which "carry a strong presumption of veracity . . ." *Torres,* 129 F.3d at 715 (citing *Blackledge v. Allison,* 431 U.S. 63, 74, 97 S.Ct. 1621, 52 L.Ed.2d 136 (1977)). Because "answers contained in [the plea proceeding] are binding," a court "cannot allow [a defendant] to disavow the answers he gave as easily as he wishes." *United States v. Winston,* 34 F.3d 574, 578 (7th Cir.1994). Therefore, a "defendant's bald statements that simply contradict what he said at his plea allocution are not sufficient grounds to withdraw the guilty plea." *Id.*

In addition, while an evidentiary hearing may be appropriate where a defendant has demonstrated factual issues surrounding the voluntariness or general validity of his plea, no hearing is required "if the movant's allegations 'merely contradict[ ][his] earlier statements made under oath at his plea allo-

cution.'" *Maher*, 108 F.3d at 1529 (quoting *United States v. Gonzalez*, 970 F.2d 1095, 1101 (2d Cir.1992)) (brackets in original); *accord Torres*, 129 F.3d at 715.

It is plain, then, that a "defendant who presents a reason for withdrawing his plea that contradicts the answers he gave at a Rule 11 hearing faces an uphill battle in persuading the judge that his purported reason for withdrawing his plea is 'fair and just.'" *Trussel*, 961 F.2d at 689. Rule 11 "provides a thorough hearing [at the time of the plea] to determine the voluntariness and intelligence of guilty pleas, and ... defendants afforded such a hearing should not be easily let off the hook when they feel like changing their minds." *United States v. Coonce*, 961 F.2d 1268, 1276 (7th Cir.1992).

The reason for this is simple: "'[s]ociety has a strong interest in the finality of guilty pleas,' and allowing withdrawal of pleas not only 'undermines confidence in the integrity of our judicial procedures,' but also 'increases the volume of judicial work, and delays and impairs the orderly administration of justice.'" *Maher*, 108 F.3d at 1529 (quoting *United States v. Sweeney*, 878 F.2d 68, 70 (2d Cir.1989) (per curiam)). "The plea of guilty is a solemn act not to be disregarded because of belated misgivings about its wisdom." *United States v. Morrison*, 967 F.2d 264, 268 (8th Cir.1992).

Benedict and the Government filed voluminous papers in connection with Benedict's motion to withdraw the guilty plea. The Court heard extensive argument from both sides on January 3, 2002. In addition, the Court conducted an evidentiary hearing over three days relating principally to Benedict's claims of ineffective assistance of counsel. Benedict testified at the hearing as did his two former lawyers, Donald M. Thompson, Esq. and Michael B. Berger, Esq. Thereafter, the parties submitted post-hearing legal memoranda.

## Benedict's Motion To Withdraw Guilty Plea

I conclude that Benedict has failed to meet the test for withdrawal of the guilty plea. Benedict has advanced several reasons for granting the motion. In large part, he claims that his former attorneys, Thompson and Berger, provided ineffective assistance of counsel in connection with the guilty plea proceedings and their trial preparation.

To fully appreciate defendant's present claims, it is helpful to set forth some background concerning this case. The indictment in this case has been pending since August 1998, when the indictment was filed against Benedict and a co-defendant, Mikel Bolander. Bolander has pleaded guilty, and it was anticipated that he would be a witness against Benedict.

The attorneys now representing Benedict are the fourth set of attorneys to represent him. At the hearing on this motion, it was established that Benedict was represented by attorney Lawrence Andolina during the pre-indictment phases of the case. Thereafter, he was represented by attorney John Parrinello up to approximately October 2000. Shortly before the originally scheduled trial date of October 30, 2000, attorney Parrinello requested leave to withdraw based on serious health matters. That request was granted and defendant was given time to obtain new counsel.

By letter entered November 30, 2000, attorneys Gary Muldoon and Donald Thompson appeared for Benedict. Michael Berger, an associate of Muldoon, later appeared and worked together with Thompson and Muldoon until they were relieved upon the filing of the present motion to withdraw the guilty plea.

Although Parrinello withdrew on the eve of trial, the Court did not immediately force the new attorneys to proceed to trial. The Court waited several months and then on January 16, 2001, the Court set a new trial date for June 19, 2001. That date was over six months from the new attorneys' entry into the case in late November 2000. From January 16 until defendant pleaded guilty on June 8, 2001, there were several occasions when Benedict and one or more of his lawyers appeared before the Court to request various relief concerning discovery and other matters in the case. There were proceedings, some of them quite lengthy, concerning the defense efforts to obtain copies of some of the electronic media involved in this case. Benedict had retained a computer expert who was analyzing the Government's evidence.

At the hearing on the instant motion, it was established that although there had been several proposed plea agreements submitted to all of Benedict's prior attorneys, including Mr. Andolina and Mr. Parrinello, Benedict had rejected those overtures and was working with his attorneys, Thompson and Berger, during the Winter and Spring of 2001, and was preparing for trial.

An event occurred during the trial preparation on or about June 1, 2002, that significantly affected both Benedict and his lawyers concerning the desirability of proceeding to trial. On June 1, Benedict himself was given an opportunity to review and examine the physical items seized from his home when he was originally arrested. At the time of the arrest, Government agents removed computers, disks and other files relating to the case. During Benedict's examination of the seized items, which occurred in Buffalo, New York, Benedict allegedly attempted to steal two disks from among the items stored by the Government for trial use. Benedict was arrested for the theft the

next day, June 2, on a complaint charging attempted theft of Government property under 18 U.S.C. § 2232(a), and he remained in jail over the weekend until Monday morning, June 4.

That arrest significantly affected the posture of the case from the defense perspective. During the next several days and culminating on June 8, when Benedict entered the guilty plea, there were intense discussions and negotiations between the Government and Benedict's lawyers to arrange a plea.

Both Berger and Thompson testified that this theft was a very damaging piece of evidence in the hands of the Government. They anticipated that evidence of the theft could be used to demonstrate consciousness of guilt, and they viewed this as a major blow to their trial efforts. It is clear from the hearing that both attorneys conveyed their dismay to Benedict in the strongest of terms. Thompson testified graphically that he told Benedict: "We're screwed ...." (Tr., p. 403), and during his testimony at the hearing, Benedict confirmed that conversation and admitted that the theft significantly adversely affected his case. (Tr., p. 520).

In addition to the theft of evidence, there were other problems with the case and the attorneys spent considerable time explaining to Benedict the difficulties that they faced should the case proceed to trial. It is clear from evidence adduced at the hearing that both Thompson and Berger believed that a trial was not in Benedict's best interest. They explained to Benedict that the numerous depictions of child pornography captured by the Government would not sit well with the anticipated jury pool in the Western District of New York. The attorneys also emphasized again their view of the strength of the Government's case. The Government had prepared several detailed charts (Exs.167, 170, 202)

that they had previously discussed with Benedict. These charts demonstrated the voluminous evidence against Benedict. The Government was prepared to show that the envelope mailed by Benedict to the co-defendant, Bolander, in California contained 85 separate files containing numerous depictions of child pornography. (Affidavit of Martin J. Littlefield, sworn to December 7, 2001 (Dkt.# 108), ¶ 38). Even at the hearing on the motion, Benedict admitted on cross-examination that the package sent from Rochester to Bolander in California did contain his handwriting. (Tr., p. 505, 508). Benedict and his lawyers were also aware that the co-defendant, Bolander, was expected to testify for the Government. In addition, they knew, as did Benedict, that the expert hired by the defense had been unable to develop any substantial defense to the Government's case from his review of the electronic evidence. Although they recognized that there were certain issues concerning preservation of evidence and the handling of both Bolander and Benedict's computers, they were pessimistic about their ability to convince twelve jurors to acquit.

During the week of June 4, there were several draft plea agreements that passed between the prosecutors and Benedict's legal team. Eventually, a plea agreement was crafted which, in the Court's view, did provide Benedict with several concrete benefits. First of all, the agreement provided that Benedict would plead to only one of the three counts against him in the indictment. The theft-of-Government-property charge would be dismissed, although the agreement did provide for a two point enhancement for obstruction of justice under § 3C1.1 of the Sentencing Guidelines for that conduct. The Government agreed that it would not oppose defendant's request to be sentenced at the lowest range of the applicable Guideline.

The agreement also precluded the Government from requesting an upward departure from the Guidelines, although Benedict also agreed not to make a downward departure motion. The plea agreement, as framed, therefore eliminated the possibility of any additional prosecution for the theft and eliminated the potential for a consecutive sentence or an upward departure. The number of pornographic photographs was substantial and, therefore, Benedict's exposure to a more severe sentence by virtue of the plea agreement was reduced.

Both attorneys acknowledged that for whatever reason, Benedict had difficulty admitting his guilt concerning the transmission of the numerous items of child pornography. Although they advised him concerning the wisdom of pleading guilty, both attorneys testified, and I credit that testimony, that they told him his admissions concerning guilt should only be made if they were true. They testified that they advised Benedict that he should not plead guilty just to end the case, but only if he were in fact guilty. (Transcript of Hearing on Motion to Vacate, March 11–13 ("[Tr.]") at 149, 410). As stated, I credit that testimony.

Apparently, there had been some discussion concerning a so-called *Alford* plea.[1] Both attorneys testified that they explained the concept of an *Alford* plea to Benedict but both advised him that neither the Government nor the Court would entertain such a plea (Tr., pp. 169, 413).

It is clear from the testimony at the hearing, as presented by Benedict's attorneys, that Benedict wanted to plead guilty and not proceed to trial but that his attorneys did not wish him to plead if he was not in fact guilty. It is clear from the testimony of the attorneys, which I accept,

1. *North Carolina v. Alford,* 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970).

that they carefully went over the plea agreement with Benedict during the course of the several days prior to the entry of the plea on June 8. Although Benedict testified to the contrary, I credit the attorneys' testimony that they explained the agreement to him in detail. Furthermore, parts of the final agreement were very similar to draft plea agreements that had been presented over the years to Benedict and his prior attorneys.

On June 8, 2001, Benedict appeared before the Court and entered his guilty plea pursuant to a written plea agreement. The plea agreement consisted of ten pages. The plea colloquy among the Court, Benedict and his attorneys and the prosecutor was extensive and consumed twenty-six pages of transcript. All of the significant portions of the agreement were discussed on the record, and the Court specifically read to Benedict the two paragraphs dealing with the factual basis for the plea. In all cases, Benedict repeatedly said that he understood the agreement, that he had no questions, that he was prepared to enter the plea, and he admitted without qualification the accuracy of the factual basis set forth in the plea agreement concerning Benedict's transmission of numerous items of child pornography. (Transcript of Guilty Plea Proceedings ["Tr. Plea"], June 8, 2001, pp. 17–19).

The Court set sentencing for September 14, 2001, and directed that a full presentence report ("PSR") be prepared. Benedict never raised any issues or concerns with the Court concerning the plea until November 13, 2001, when Benedict filed the instant motion to withdraw the guilty plea.

Although Benedict now, belatedly, claims actual innocence, it appears from his own testimony that it was not his "innocence" that triggered the motion, but two incidents that occurred during the preparation of the PSR. First, Benedict himself testified that a newspaper article in the local paper describing the plea and Benedict's child pornography activity disturbed and upset him. It upset Benedict enough that he approached his lawyers about writing a response or rebuttal to the newspaper article, but the lawyers counseled against that. In addition, in August 2001, Benedict accompanied his lawyers for their first visit with the probation department as part of its preparation of the PSR. It is clear that Benedict was exercised when he viewed the Government's version of his child pornography activities. He was upset that this description would follow him into the prison system, and he felt that he could not set forth his own "version" of events which was, of course, inconsistent with his clear admission of guilt in the plea agreement and at the entry of the plea in court. It appears, therefore, from Benedict's testimony that these two events, not his actual innocence, were instigating events which led him to seek to withdraw the guilty plea.

■ These two occurrences, the newspaper publicity and the interview with probation, do not justify withdrawal of the guilty plea. Although those events may explain Benedict's motivation, neither constitutes a fair and just reason to allow withdrawal of the guilty plea. The fact that a defendant dislikes publicity about his crimes or is unhappy with the contents of the PSR does not provide a basis for withdrawal of the plea. *See United States v. Underwood,* 174 F.3d 850, 853 (7th Cir. 1999) (defendant's "disquiet" from reading unfavorable PSR did not justify withdrawal of guilty plea). Benedict's present motion appears to be nothing more than the actions of a defendant who has second thoughts about the guilty plea because of the prospect of an unfavorable PSR.

■ In his motion to withdraw the plea and at the hearing, Benedict directly, and

through counsel, raised several grounds for withdrawal of the plea. Benedict claims that his prior counsel were ineffective in working out the plea agreement terms and in failing to properly prepare for trial. Benedict now claims that he has a new computer expert (this is the second one hired by the defense) who now believes, many months after the entry of the plea, that there are weaknesses in the Government's case, especially concerning the computer evidence. Benedict claims that those reasons, coupled with his professed innocence, warrant vacating the guilty plea. I disagree.

█ First of all, Benedict makes much of the fact that he has hired a new computer expert who challenges a portion of the Government's evidence. Although this expert is more direct, it is clear that the defense always sought to challenge the Government's activities concerning the seizure of Benedict's computer and the contents of the files located there. The defense seeks to challenge Benedict's ability to transmit pornographic material, but that is not remarkably different from what the defense always attempted to demonstrate in this case. The Government's expert and the defense expert disagreed before and they surely disagree now concerning the strength of the evidence and the qualifications of the respective experts. But, just because Benedict now believes his chances at trial might be more favorable than they would have been in June 2001, is no reason to allow withdrawal of the guilty plea. A defendant's assessment that due to changed circumstances he has a better chance of winning is not an acceptable basis to allow withdrawal of the guilty plea. *See United States v. Picone*, 773 F.2d 224, 226 (8th Cir.1985) ("A plea cannot be withdrawn simply because the defendant suddenly realizes that he might be acquitted"); *cf. United States v. Martinez–Molina*, 64 F.3d 719, 733 (1st Cir.1995) (rec-

ord supported district court's finding that defendant's guilty plea had been entered voluntarily and that his claim of coercion merely reflected second thoughts about the wisdom of his decision after learning that two codefendants had been acquitted at trial). Such a view permits a defendant to manipulate the system, and that is precisely what Benedict to seeks to accomplish in this case.

Nor do I find that Benedict's claims of ineffective assistance of counsel warrant the relief requested. The standards for determining ineffective assistance claims under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), are well established in this Circuit. Most recently this Court ruled on a similar claim of ineffective assistance of counsel in *United States v. Aquino*, 207 F.Supp.2d 54 (W.D.N.Y.2002). The Court set forth in that decision the standards for such a challenge: A claim of ineffective assistance must be analyzed according to the standards set forth by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The Court stated in *Strickland* that the test for an ineffective-assistance claim is whether the defendant received "reasonably competent assistance." *Id.* at 688, 104 S.Ct. 2052. In deciding this question, the court must apply an objective standard of reasonableness. *Id.*

Generally, defense counsel is "strongly presumed to have rendered adequate assistance..." *Id.* at 690, 104 S.Ct. 2052. To succeed on such a claim, then, the defendant must "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689, 104 S.Ct. 2052 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)).

If defense counsel's performance is found to have been defective, relief may only be granted where it is shown that the defense was actually prejudiced by counsel's errors. *Strickland,* 466 U.S. at 692, 104 S.Ct. 2052. Prejudice is established upon a showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052. The court determines the presence or absence of prejudice by considering the totality of the trial evidence. *Id.* at 695, 104 S.Ct. 2052.

It is clear that Benedict's present claims are nothing more than after-the-fact criticisms of reasoned strategic judgments made by trial counsel. After evaluating the testimony of Benedict's prior lawyers and Benedict's own testimony, I find that Benedict's lawyers believed that trial was not in Benedict's best interest. In light of the number of visual depictions of child pornography, I agree with defense counsel's assessment that such evidence would have been alarming, to say the least, to the rather conservative jury pool that could be expected in this area. In spite of Benedict's assertions, the Government's proof appeared then, and appears now, to be compelling. There is both direct and circumstantial evidence directly linking Benedict to the transmission of child pornography. Benedict's co-defendant, Mikel Bolander, was expected to testify and implicate Benedict, as Bolander did during his guilty plea colloquy with the Court when he pleaded guilty on August 26, 1999. Government Appendix of Exhibits, December 10, 2001, Ex. X at 24.

It is true that the defense had some difficulties obtaining copies of some of the electronic media. The record is also clear though that this material, in its original form, was always available to the defense. In fact, prior to the scheduled trial date in June 2001, defense experts analyzed some of the original evidence. It is also true that the defense orally requested that the trial be adjourned. Because one trial date scheduled for October 2000, was adjourned due to prior counsel's illness and withdrawal, the Court's decision in January 2001, to schedule a trial some six months away in June 2001 was not a date likely to be changed.

Therefore, as the firm trial date approached, defense counsel needed to make a determination as to whether to proceed to trial or seek a disposition. The events of June 1, involving Benedict's theft of some of the evidence was a crucial blow to the defense strategy. Both defense counsel testified, and I credit that testimony, that such evidence would have been very damaging. It seems to me, therefore, quite reasonable for defense counsel to broach a disposition with their client and the Government. At the hearing, Benedict testified that he felt that he had no choice but to plead guilty. The facts do not support that. Benedict could have maintained his innocence and proceeded to trial. The fact is, and I so find from the testimony, that Benedict did not wish to proceed to trial. His attorneys had specifically warned him of the strength of the Government's case, and it is clear to me that he made an affirmative choice to plead guilty and work out the best possible negotiated plea. Although the defense lawyers knew there may have been some chinks in the Government's case concerning the handling of the electronic media, they were not confident, in light of the theft of property and other matters, that a favorable outcome would result if they went to trial.

I also credit defense counsel's testimony that they did not coerce Benedict into pleading guilty. They told him that he should plead and admit the facts involving child pornography only if it were true, that

is, if he in fact did transmit the pornographic pictures. I believe the proof demonstrates that Benedict made a conscious, rational decision to take the plea and avoid the much riskier course of proceeding to trial.

I find Benedict's testimony at the hearing to be false and perjurious concerning the circumstances surrounding the guilty plea. In fact, I find his testimony to be one of the most blatant examples of false testimony that I have ever heard. It is clear from the testimony in the case that Benedict paid close attention to what his lawyers were doing and the defense preparations. He took some pride in advising the Court that he was an engineer and was careful and attentive to details. In fact, he testified that he was upset when he learned that his lawyers had waived his presence for some proceedings before the Court. At the hearing, however, when it came time to discuss whether the lawyers had briefed him on the contents of the plea agreement, Benedict claimed that he "trusted his lawyers" and did not read the agreement. In essence, he said the lawyers believed it was all right, so he did not need to read the agreement. I find this to be a total fabrication. Based on my observations of Mr. Benedict at the hearing and the testimony about his participation in his defense, I find it incredible that he would come to court and plead guilty without having carefully examined the plea agreement. I credit his lawyers' testimony that they carefully reviewed each and every paragraph of the agreement.

Benedict's mendacity was underscored several times at the hearing. Perhaps the most notable example was when he claimed that he had *never* read the factual basis for the charge that was contained in the plea agreement until *after* the plea was taken on June 8, 2001. In fact, at the hearing, Benedict testified that he did not read the plea agreement until "several weeks" after the guilty plea proceeding. (Tr., p. 521). On its face, that statement is incredible, but the absurdity of it was further demonstrated by the fact that the Court itself specifically read aloud, word for word, the entire factual basis set forth in the plea agreement at the time that Benedict entered his guilty plea. The factual basis that was contained in the plea agreement (¶ 5) which was read verbatim to the defendant during the plea colloquy was detailed and specific concerning Benedict's activities involving child pornography and is set forth here:

> From at least early May 1994 to January 1995, the defendant, from Rochester, New York engaged in a series of communications with Mikel Bolander in El Cajon, California which involved child pornography. These communications discussed, among other things, naming conventions for the child pornography files on their respective computers. During these communications, the defendant referred to himself or was called "LB" or "L", while Mike Bolander referred to himself or was called "MB".
>
> On or about January 25, 1995, the defendant, from the Rochester New York area, knowingly transported by U.S. mail to Mikel Bolander in El Cajon, California a package enclosing, among other things, a data backup tape labeled "QIC–80 FORMAT MINICARTRIDGE" which tape contained 85 files each of which contained depictions of sexual intercourse involving children or lascivious depictions of the genital and pubic area of children, some of which involved children under the age of twelve.

In court, after that reading, Benedict acknowledged that he had reviewed with his lawyers the evidence that the Government intended to submit at trial and, with specific reference to the factual basis para-

graphs that had just been read to him by the Court, Benedict acknowledged that he did not "contest or dispute the accuracy of what the Government intends to prove at trial should this go to trial." (Tr. Plea, p. 19).

Furthermore, during the plea colloquy, Benedict was specifically directed to read to himself the paragraphs in the plea agreement that described the elements that the Government would be required to prove at trial beyond a reasonable doubt. He did so and stated that he understood those elements (Tr. Plea, pp. 17–18). In addition, there was much more discussion by the prosecutor on the record about the plea agreement and the Guideline calculations applicable because of the nature of Benedict's conduct. (Tr. Plea, pp. 6–14). The prosecutor advised that the Guideline range would be increased because the pictures at issue contained depictions of children under twelve years old. The prosecutor stated, "the defendant is agreeing [that] these pictures do involve individuals less than twelve." (Tr. Plea, p. 7).

The prosecutor went on to advise that an enhancement would be made because some of the pictures contained sadistic conduct (Tr. Plea, p. 7), and he also referenced the fact that there would be an adjustment for obstruction of justice based on Benedict's theft of evidence (Tr. Plea, p. 8).

After the prosecutor's lengthy recitation concerning the terms of the agreement, much of which specifically related to Benedict's conduct, Benedict admitted that the prosecutor's summary was accurate and he responded negatively when the Court asked if he had "any dispute or quarrel with anything [the prosecutor] said about the nature of the agreement." (Tr. Plea, p. 14).

Benedict's lack of candor and evasiveness at the hearing concerning what occurred during the plea proceedings was evident when he seemed to agree with the prosecutor that Benedict only hears what he wants to hear. (Tr., pp. 532–533). This mind set was displayed in its most bizarre form at the hearing when Benedict asserted that his many statements at the plea colloquy concerning the contents of the plea agreement only reflected his understanding of the *prosecutor's* interpretation of the agreement, not his own. (Tr., pp. 533,549). This explanation is, in a word, unbelievable.

As is demonstrated by the plea colloquy, Benedict consistently and affirmatively stated his understanding concerning the plea agreement and his acceptance of it. There was no confusion, ambiguity or hesitation of any kind by Benedict when he answered, under oath, all of the questions posed to him by the Court concerning his acceptance and understanding of the plea agreement.

The law is clear that a defendant's statements in support of a motion to vacate which directly contradict statements made under oath during the plea colloquy should be given short shrift. In fact, the authority is such that under those circumstances, the Court need not even hold a hearing concerning the defendant's motion to vacate. *United States v. Gonzalez,* 970 F.2d 1095, 1100 (2d Cir.1992) ("No hearing need be granted when the allegations on a motion to withdraw a guilty plea before sentencing merely contradict the record, are inherently incredible, or are simply conclusory"). Benedict's statements now directly contradict numerous statements made under oath, on the record, at the plea colloquy relating to the plea agreement and his understanding of it. I recall the plea colloquy quite well and there was no hesitation on Benedict's part and no indication that he was confused, under the influence of any drugs or medicine, or that he was reluctant to enter the plea.

Benedict now claims that the plea collo-quy was somehow deficient because the Court failed to comply with Fed.R.Crim.P. 11(f) which requires the Court to be satisfied that there is a "factual basis" for the plea. The record here amply demonstrates a factual basis to accept Benedict's guilty plea to the charge that he knowingly transported child pornography by mail. Defendant's admissions and acknowledgment of the accuracy of the factual basis paragraphs in the agreement provided more than adequate basis for the Court to find the requisite factual basis to support the plea. To suggest otherwise, betrays a lack of understanding about what Rule 11(f) requires.

 "In making its factual-basis determination, the court is not required to rely solely on the defendant's own admissions." *United States v. Maher*, 108 F.3d 1513, 1524 (2d Cir.1997). Nor is there any "specific dialogue" that must take place in order to comply with Rule 11(f)'s requirement that the district court satisfy itself that there is a factual basis for the plea. *United States v. Andrades*, 169 F.3d 131, 136 (2d Cir.1999). "The court may rely on defendant's own admissions, information from the government, or other information appropriate to the specific case." *Id.* (citing *Maher*, 108 F.3d at 1524); *see also* Fed.R.Crim.P. 11 Advisory Committee Note (1974) ("An inquiry might be made of the defendant, of the attorneys for the government and the defense, of the presentence report when one is available, or by whatever means is appropriate in a specific case"). "Thus, so long as the facts relied on are placed on the record at the time of the plea, 'the district court, in determining whether there was a factual basis for the plea, [i]s free to rely on any facts at its disposal-not just the admissions of the defendant.'" *Maher*, 108 F.3d at 1524–25 (quoting *Irizarry v. United States*, 508 F.2d 960, 967 (2d Cir.1974)).

None of Benedict's reasons for vacating the plea warrant that relief. This case has been pending since 1998. Benedict's first trial was aborted on the eve of trial because of his attorney's illness and his request to be replaced as counsel. Benedict pleaded just before his next scheduled trial date because it was clearly in his interest to do so. His complaints now amount to nothing more than second-thoughts and a gross manipulation of the system. The Government has been disadvantaged by Benedict's ploy. The Government was ready for trial on two separate occasions. Had Benedict claimed what he now claims immediately after entry of the plea on June 8, 2001, the trial could have promptly proceeded or have been rescheduled in short order. Benedict did not do that though. He waited many months to raise matters that could have been raised much earlier. Benedict's tactics have not only discomforted the Government but have caused this Court to expend substantial judicial resources on matters that need not have been addressed.

### CONCLUSION

The defendant's motion to withdraw his guilty plea (Dkt.# 104) is denied.

Sentencing is scheduled for August 19, 2002 at 10:00 a.m.

IT IS SO ORDERED.